**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re: | |
| | Bankruptcy Case No. 23-12555 TBM |
| RITA RENEE LEWIS, | Chapter 13 |
| | |
| Debtor. | |

---

**ORDER GRANTING MOTION FOR RELIEF FROM STAY AND DENYING**
**CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN**

---

In 2021, Shopneck Family Foundation ("Shopneck") loaned $455,000.00 to non-debtor RL Entertainment Group ("RL"), a Colorado limited liability company wholly owned by Debtor, Rita Rene Lewis (the "Debtor), on a short-term basis at a relatively high interest rate.  RL used the funds to purchase real property and improvements located at 2400 N. Olive Street, Denver, Colorado (the "Property").  The loan was secured by the Property.  The Debtor is not an obligor or guarantor of the obligation owed by RL to Shopneck.  RL defaulted by failing to make all required monthly payments to Shopneck.  So, Shopneck advised RL that Shopneck intended to commence a foreclosure action against the Property to satisfy the obligation.

Days later, the Debtor caused RL to transfer the Property to herself — for no consideration.  The transfer violated RL's loan terms and obviously was made by the Debtor in bad faith to stop Shopneck's collection efforts against RL and the Property.  Then, in the second stage of her avoidance stratagem, the Debtor filed for bankruptcy protection under Chapter 13.  Next, she proposed a Chapter 13 plan to effectively restructure RL's debt to Shopneck by reducing the interest rate and extending the payment terms.

Two disputes are presently before the Court.  First, Shopneck filed a "Motion for Relief from Automatic Stay" (Docket No. 36[1], the "Stay Relief Motion") to continue a foreclosure action against the Property.  The Debtor submitted a "Response in Opposition to Motion for Relief from Stay.  (Docket No. 39, the "Response.")  Second, the Debtor sought confirmation of her "Second Amended Chapter 13 Plan." (Docket No. 31, the "Third Plan.")  Shopneck submitted an "Objection" to confirmation of the Third Plan.  (Docket No. 38, the "Confirmation Objection.")  On December 13, 2023, the Court conducted a trial on the two contested issues: relief from stay and confirmation (the

---

[1]     The Court will use the convention "Docket No. ___" when referring to a document filed in the CM/ECF docket sheet of the Debtor's bankruptcy case:  *In re Lewis*, Case No. 23-12555 (Bankr. D. Colo.).

"Combined Hearing").  For the reasons set forth below, the Court grants the Stay Relief Motion and denies confirmation of the Third Plan.

## I.      Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the combined issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334.  Shopneck's Stay Relief Motion and the Debtor's Response and the Chapter 13 plan confirmation issues are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), § 157(b)(2)(G) (motions to terminate, annul, or modify the automatic stay), § 157(b)(2)(L) (confirmation of plans), and § 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  No party has contested the Court's jurisdiction or venue.

## II.      Procedural Background.

On June 12, 2023 (the "Petition Date"), the Debtor filed her Petition (Docket No. 1, the "Petition") under Chapter 13 of the Bankruptcy Code.[2]  The Debtor filed for bankruptcy to stop the foreclosure initiated by Shopneck on the Property.[3]  After failing in a few prior confirmation attempts, on October 4, 2023, the Debtor submitted her Third Plan.  (Docket No. 31.)  About two weeks later, Shopneck filed its Confirmation Objection to the Third Plan.  (Docket No. 38.)  Meanwhile, two days after the Debtor filed her Third Plan, Shopneck filed its Stay Relief Motion.  (Docket No. 36.)  The Debtor opposed the Stay Relief Motion through the Response.  (Docket No. 39.)  In accordance with the procedures established by L.B.R. 4001-1(c), this Court conducted a Preliminary Hearing (the "Preliminary Hearing") on the Stay Relief Motion and the Response on October 24, 2023.  (Docket No. 42.)

At the Preliminary Hearing, the parties advised the Court that there were three main areas of disputed fact: the value of the Property; the amount of the debt owed to Shopneck; and the Debtor's good faith in filing her Petition and the Third Plan.  The parties agreed that those same factual issues also were at issue with respect to confirmation of the Third Plan and the Confirmation Objection.  Thus, the parties requested the Court to conduct a combined evidentiary hearing on both: (1) the Stay Relief Motion and the Response; and (2) the Third Plan and the Confirmation Objection.

The Court concurred that a combined evidentiary hearing was appropriate.  As required by Section 362(e), the Court also found that compelling circumstances existed to convene a final hearing on the Stay Relief Motion more than 30 days after the

---

[2]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

[3]      The Debtor and Shopneck have sometimes referred to the Property as "2400 N. Olive Street, Denver, Colorado," "2400 North Olive Street, Denver, Colorado," or simply "2400 Olive Street, Denver, Colorado" (with no reference to direction).  All references are to the same Property.

Preliminary Hearing.  The Court set the final Combined Hearing for December 13, 2023. (Docket No. 42.)

The Court conducted the Combined Hearing on December 13, 2023.  The Debtor testified.  She also presented the testimony Muriel Williams-Thompson, a licensed real estate broker ("Ms. Williams").  The Court admitted into evidence Debtor's Exhibits B, C, D, I, J, K, L, M, N, O, P, Q, R and T.  After cross-examining the Debtor and Ms. Williams, Shopneck called two other witnesses: Kerry Dunn, a certified professional residential appraiser ("Mr. Dunn"); and Patrick (Rick) Hicks ("Mr. Hicks"), a representative of PineTree Financial Corporation ("PineTree"), which is an affiliate of Shopneck.  The Court admitted into evidence Shopneck's Exhibits 1, 3, 5, 6, 7, 8 and 9.

Having considered the evidence presented through the testimony of the witnesses and the exhibits admitted into evidence, the Court is now prepared to rule. The Court concludes that Shopneck is entitled to relief from stay under Section 362(d) and the Third Plan cannot be confirmed.

### III.    FINDINGS OF FACT.

Pursuant to Fed. R. Civ. P. 52(a), which is made applicable to contested bankruptcy matters by Fed. R. Bankr. P. 9014 and 7052, the Court makes the following findings of fact based on the testimony and exhibits admitted at the Combined Hearing.

### A.    The Pre-Petition Events.

#### 1.   Ms. Lewis and RL Entertainment Group.

The Debtor (Ms. Lewis) is an attorney who graduated from the University of Colorado School of Law in 1994.  She is not currently licensed to practice law in the State of Colorado but was licensed in the State of Washington in 2006.  On July 8, 2020, the Debtor formed a Colorado limited liability company: RL Entertainment Group ("RL").  (Ex. 7.)  Since RL's formation, the Debtor has been the sole Member of RL. She formed the company to carry on a business representing athletes and entertainers in contract negotiations.  She operated the business out of the Property.  She only had a couple of clients and considered it a part time venture.  The Debtor also used RL to advise on immigration matters.  However, RL was not particularly successful.  As of the Petition Date and for the seven months prior, the Debtor also was employed as an attorney with Beacon Hill Staffing Group.  (Ex. C at 38.)

#### 2.   RL Purchases the Property.

The Property is a house located in the Park Hill neighborhood of Denver, Colorado.  The Debtor currently resides at the Property and has resided there continuously for 9 years (*i.e.,* since about 2015).  Initially, she rented the Property from a third-party landlord-owners (Steve Gulick and Amie Gulick).  At some point during the

spring of 2021, the landlord-owners offered to sell the Property to the Debtor for $650,000.00 provided that the closing occur within two months.

The Debtor was interested but did not have the funds to purchase the Property outright.  So, she set about to obtain third-party financing.  It was difficult given the short closing window.  A mortgage broker, Bruce Wilson, connected the Debtor with Patrick (Rick) Hicks at PineTree (an underwriter and affiliate of Shopneck).  Shopneck was the proposed lender.  Shopneck is a "hard money lender" and does not engage in the consumer mortgage business.  Shopneck offered a high-interest short-term loan to RL to permit RL to buy the Property for business investment purposes.

On June 22, 2021, Shopneck loaned RL $455,000.00 to purchase the Property. RL executed a Promissory Note promising to repay the debt.  (Ex. 1, the "Promissory Note.")  The obligation under the Promissory Note was short-term: the Promissory Note matured on June 21, 2023.  The debt under the Promissory Note bore non-default interest at the rate of eleven percent (11%) per annum.  The default interest rate was much higher: twenty nine percent (29%) per annum.  RL committed to make monthly payments of $4,170.83 to Shopneck until the Promissory Note matured and was paid in full.  The Promissory Note contained other typical terms including charges for late fees and reasonable attorneys' fees for costs of collection.  The indebtedness under the Promissory Note was secured by a Deed of Trust on the Property executed by RL.  (Ex. 1, the "Deed of Trust.")  And, RL also signed a "Loan Agreement" with Shopneck.  (Ex. 5, the "Loan Agreement.")

The Debtor, as the sole Member of RL, executed each of the foregoing documents (the Promissory Note, Deed of Trust, and Loan Agreement) on behalf of RL as its "Member."  The Debtor did not sign in her individual capacity and was not obligated personally as a guarantor on the Promissory Note.  The Property was purchased by and titled in the name of RL (subject to the Deed of Trust).  The Debtor testified that RL purchased the Property because she was under time pressure from the landlord-owners to close the sale and she did not think a traditional consumer mortgage loan to herself would close quickly enough.

### 3.     The Shopneck Family Foundation.

Shopneck is a self-described "hard money" lender.  Mr. Hicks confirmed that Shopneck, as an affiliate of PineTree, only makes commercial loans.  He testified that consumer loans are highly regulated whereas commercial loans are less regulated. Typically, Mr. Hicks indicated, the borrowers that come to PineTree and Shopneck do not qualify for traditional financing.  As such, the loans are high risk for Shopneck and priced with high interest rates for the borrowers.

Because Shopneck does not lend to individual consumers, PineTree required RL to provide Shopneck with the RL Articles of Organization and a letter from an attorney certifying that RL (as the borrower) was a business and not an individual consumer. The Debtor did not recall retaining a lawyer for RL for that purpose.  However, Jerry

Cardwell, a Colorado attorney practicing with the Cardwell & Associates law firm and acting as counsel for RL, sent a letter, dated June 21, 2021, to Mr. Hicks at PineTree. (Ex. 6 at 1, the "Attorney Letter.")  In the Attorney Letter, Mr. Cardwell stated:

> The undersigned [Jerry Cardwell] is counsel to RL Entertainment Group LLC ("RL"), a Colorado limited liability company, and purchaser of that certain property located at 2400 North Olive Street, Denver, CO 80207 . . . .  RL is in the business of investments, and desires a loan to assist in the operation and development of its business . . .  RL is aware that PineTree Financial Corporation's financing is structured as a commercial loan whose terms and conditions differ from standard consumer mortgage loans . . .  RL, by and through its sole certificate holder Rita R. Lewis, has indicated to me that she understands the foregoing matters and that PineTree Financial Corporation's financing is a commercial loan and not a typical consumer loan  . . . .

The Attorney Letter indicates that it was copied to the Debtor.  (Ex. 6 at 1.)  Mr. Cardwell prepared an invoice for his representation of RL charging $350.00.  (Ex. 6 at 2.)

The Attorney Letter is consistent with the Loan Agreement executed by the Debtor as the sole Member of RL.  The Loan Agreement states:

> **BUSINESS PURPOSE:**  The Borrower(s) [RL] certify, under oath, that the loan is made for business, investment or commercial purposes, and is not for personal, family or consumer purposes, as defined by State or Federal law. The Borrower(s) certify that they have made statements of fact to the Lender or Loan Broker that the proceeds of the loan are to be used primarily for business, commercial, or investment.  Borrower(s) are aware that the Lender is relying on statements made, and due to limited time and opportunity to consult and investigate, may not be able to make this determination independently.  Borrower(s) state that the purpose of the loan is intended to be: To purchase house for investment purposes.

(Ex. 6 at 1.)

The Debtor testified that she did not recall receiving the Attorney Letter or a billing statement from Mr. Cardwell.  However, she seemed to acknowledge that she may have paid his fees at the closing on the Property.  The Settlement Statement (Ex. 8) reflects that Mr. Cardwell was paid $350.00 at the closing for his opinion letter. Accordingly, the Court finds the Debtor's testimony (trying to distance herself from the

representations in the Attorney Letter and the Loan Agreement) not credible.  The Debtor knew that RL was buying the Property (not the Debtor personally) and represented to Shopneck that RL was doing so for business investment purposes.

### 4.   Additional Terms of the Deed of Trust.

Although the Court has generally described the terms of the Promissory Note and Deed of Trust (above), additional terms of the Deed of Trust are relevant to the dispute. The Deed of Trust included a "due on sale" clause and the following provisions:

      i.      Paragraph 18 provides that ". . . upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, . . . at Lender's option and without notice to the Borrower, all of the sums secured by this Deed of Trust shall be immediately due and payable (Acceleration)."

      ii.     Paragraph 24 states that in the event of a "Transfer" of the Property and "at the election of the Lender": "all sums secured by this Deed of Trust shall become immediately due and payable (Acceleration)."

      iii.    The Deed of Trust, also at Paragraph 24, defines a "Transfer" to include: "a transfer or conveyance of title (or any portion thereof, legal or equitable) of the Property (or any part thereof or interest therein) . . ."

### 5.   Monetary Default on the Promissory Note.

Under the Promissory Note, RL was obligated to make monthly payments to Shopneck of $4,170.83 due on the first day of each month starting on August 1, 2021. For the months of August 2021 through February 2022, RL made the required monthly payments (although in some months the payments were a few days late and slightly less than required). (Ex. L.)  But starting in March 2022, RL's payments became erratic. The March and April 2022 payments were about a month late. (*Id.*)  The May, June and July 2022 payments were just a few days late. (*Id.*)  In August and September 2022, RL unilaterally began to make untimely partial payments. (*Id.*)  RL made the October 2022 payment about two months late.  The November and December 2022 and January 2023 payments were about three months late. (*Id.*)  And, then RL stopped paying altogether. The last payment by RL was dated March 31, 2023 (for the January 1, 2023 payment). (*Id.*)  Many of RL's late payments did not include contractual late fees.  (The Debtor herself tried to pay a $4,170.55 payment on the Promissory Note on or about June 30, 2023.  (Ex. M.)  However, that payment was returned by Shopneck.)

Meanwhile, in October and November 2022 (when it became apparent that RL was not timely meeting its obligations under the Promissory Note), Shopneck sent RL letters endeavoring to work with RL to cure the late payments.  (Ex. N at 4-5.) Shopneck also stated its concerns about the status of the Loan.  The Debtor testified that she started trying to search for conventional consumer mortgage financing to pay

off the Promissory Note in February of 2023.  However, she was not able to get traditional financing (either personally or for RL).

On May 1, 2023, Shopneck sent RL another letter.  (Ex. N at 11.)  At that point, the Promissory Note maturity date of June 21, 2023 was rapidly approaching.  The May 1, 2023 letter advised RL that Shopneck would "not be extending your note when it matures on June 21, 2023.  The entire principal, interest and fees will need to be paid on or before that date."  *Id.*

On May 15, 2023, Shopneck sent RL a letter which included a payoff statement advising RL that the balance due on the Promissory Note was $541,813.31 through May 31, 2023 (the "May 15 Letter").  RL identified the per diem interest accrual as $366.50.  (Ex. O.)

The May 15 Letter also included the following notice:

> Due to the default in payment, our client has instructed our law firm to commence a Public Trustee foreclosure of the Deed of Trust.  Please be advised that since the foreclosure is an ongoing action, we can only estimate the fees and costs expected to be incurred by the "good through date" on this statement [May 31, 2023].  Some of these fees and costs may not yet have been incurred.  Upon receipt of good payoff funds, we will discontinue the foreclosure as soon as possible and you will be reimbursed for any fees and costs not actually incurred.

(*Id.*)

### 6.   The Transfer of the Property to the Debtor.

Within three days of receiving the May 15, 2023 Letter, the Debtor embarked on a scheme to block Shopneck from collecting the debt owed under the Promissory Note.  On May 18, 2023, the Debtor, as "Member" of RL, executed a Quitclaim Deed transferring the Property from RL to herself.  (Ex. Q, the "Quitclaim Deed.")  The Quitclaim Deed stated that RL (as Grantor)

> for and in consideration of $0.00 . . . quitclaims, unto the Grantees [defined as Rita Renee Lewis] . . . all the right, title, interest, claim and demand which the Grantor has in the real property [the Property] . . . .

At the bottom of the Quitclaim Deed, the Debtor typed in: "*I, Rita Renee Lewis, hereby assume the loan from RL Entertainment Group LLC on this property, will maintain and be responsible for the upkeep of this property.*"  (Ex. Q.)  The Debtor promptly recorded the Quitclaim Deed transferring the Property from RL to herself in the real

property records of Denver County, Colorado.  (*Id.*)  The transfer of the Property to the Debtor was made for no consideration and without approval of Shopneck.

At trial, the Debtor's explanation for the transfer was that RL was not making any money, so in May 2023, she dissolved RL.  In fact, she dissolved RL about a week later on May 25, 2023.  (Ex. C at 14.)  The Debtor testified that she wanted to pay all her creditors so she did not have any other choice than to transfer the Property.  She quitclaimed the Property to herself she said, so she could pay for it personally.  Notably, the Debtor did not inform Shopneck that she had transferred the Property to herself at the time of the transfer.  And, she did not obtain Shopneck's agreement to permit her to assume the Promissory Note.  The transfer triggered another default under the Promissory Note and Deed of Trust (in addition to prior defaults for failure to make monthly payments).  Such transfer was a violation of the "due-on-sale" clause in the Deed of Trust.  The Court finds that the Debtor's explanation of the reasons for transferring the Property from RL to herself (just after Shopneck had advised that it would be initiating foreclosure proceedings to collect on the debt due under the Promissory Note) was not at all credible.  Plainly, in making the improper transfer, the Debtor was attempting to block Shopneck from collecting the debt owed by RL which was secured by the Property.

**B.      The Petition and Post-Petition Events.**

**1.      The Petition.**

Less than a month after transferring the Property from RL to herself, on June 12, 2023, the Debtor filed her Chapter 13 Petition.  Her explanation:  A foreclosure of the Property was set for September 21, 2023 (Ex. C at 10.)  According to the Debtor, she had to make a decision and did not know what else to do; so she filed her Chapter 13 case.  The Court finds that explanation not credible.  Instead, Court finds that the bankruptcy filing was the second step of the Debtor's strategy to block Shopneck from collecting the debt owed by RL under the Promissory Note.

**2.      Debtor's Assets and Liabilities and Income.**

When the Debtor filed her Petition, she scheduled the Property as her most significant asset.  She also identified the debt owed to Shopneck secured by the Property as her most significant debt.  She scheduled the following assets and liabilities:

| **Assets**: | **Value**: |
|---|---|
| The Property | $784,600.00 |
| Personal Property | $  22,234.00 |
| **Total**: | $806,834.00 |

| Liabilities: | Amount: |
|---|---|
| Debt to Shopneck | $541,813.00 |
| Debt to Denver Treasurer | $   2,497.00 |
| **Total Secured Debt**: | $544,310.00 |
| | |
| Priority | $        0.00 |
| Unsecured (Non Student Loan) | $ 33,998.00 |
| Student Loan | $176,688.00 |
| **Total Unsecured Debt**: | $210,686.00 |

(Ex. C at 16-24.)

On her Schedule C, "The Property you Claim as Exempt," the Debtor claimed a homestead exemption (pursuant to COLO. REV. STAT. § 38-41-201(1)(b) which is $350,000.00 for an owner who is over 60 years old or disabled) in the Property in the amount of $242,787.00 (Value of Property of $784,600.00 – Shopneck Debt of $542,813.00).  (Ex. C at 25.)

The Debtor's initial Schedules I and J (Ex. C at 38-41) showed that the Debtor was employed for seven months as an attorney by "Beacon Hill Staffing Group."  Her gross monthly income was $9,828.29, and her monthly expenses (including a $4,171.00 monthly mortgage payment) were $8,734.52 leaving a mere $130.00 per month to pay creditors (after also accounting for payroll deductions).  Based upon her income stream for the 6-month period prior to filing the Petition, the Debtor's income is substantially higher than the median family income of the same size household.  (Ex. F).  Thus, she is an "above median income" debtor requiring that she commit to making payments under a Chapter 13 plan for 60 months.  The Debtor filed amended Schedules I and J on October 4, 2023 (Ex. J) in which she stated she had the same earnings from Beacon Hill Staffing Group.  However, she added $2,000.00 per month income as rent from a roommate.  She noted that the roommate would not be able to pay the full amount in October and November but would begin paying the full amount in January 2024.

On the eve of the Combined Hearing, the Debtor obtained a job offer as a contractor serving Bank of America.  (Ex. T, the "Job Offer").  The Job Offer set out a series of steps, including finger printing, background checks, professional references, employment verification for the "last 2 years," and I-9 Verifications, that the Debtor would need to take before getting a start date.  The Job Offer stated that the Debtor would receive pay at $80.26 per hour.  The Debtor testified that she would gross approximately $13,000.00 per month and that she was starting work under the Job Offer the week of the Combined Hearing.  She is hopeful that the increased income will help her with getting a new loan.  During her cross examination, the Debtor testified that she was being hired for six months to a year as a contractor for Bank of America and there was a possibility after that period, she could be hired for full time work with Bank of America.  However, there is no guarantee the position will last longer than six months.

3.      **The Third Plan**.

Having failed to obtain confirmation of two prior Chapter 13 plans, on October 4, 2023, the Debtor filed her Third Plan (which is the operative Chapter 13 plan).  In the Third Plan, the Debtor proposed to pay the Chapter 13 Trustee: three monthly payments of $130; 15 monthly payments of $4,600; one monthly payment of $575,000; and 41 monthly payments of $1,100.  With respect to the Property and Shopneck, she stated:

> The debtor intends to either sell her personal residence located at 2400 Olive Street, Denver, CO 80207, or to refinance the loan associated with that property on or before month 18 of the Plan and will use the proceeds to fund the lump sum payment in month 19 of the plan.  Upon the sale of the real property located at 2400 Olive Street, Denver, CO 80207, or upon the refinance of the mortgage held by the Shopneck Family Foundation, the debtor will pay the claim in full at an interest rate of 5.00%.  If the Shopneck Family Foundation note is not paid in full as described herein on or before January 15, 2025, the debtor will either dismiss this case or convert to chapter 7 on or before February 15, 2025.

The proposed lump sum amount does not take into account accrual of default interest at the rate of 29% per annum (which equates to $366.50 per diem) or even the 11% non-default contractual interest rate.  (Ex. O).  Since the commencement of the Debtor's Chapter 13 bankruptcy on the Petition Date, Shopneck has not received any payments on the Promissory Note.  The Debtor's attorney conceded that Shopneck would start receiving payments only after the Third Plan was confirmed and the Debtor's attorney was paid.  Shopneck filed its Objection to the Third Plan.

The Debtor apparently selected the 5% interest rate contained in the Third Plan unilaterally and without reference to the Promissory Note.  She indicated that when she (or RL) started to look for traditional consumer financing around the early part of 2023, she saw rates of around 6% or 7 %, but, not as high as 11%.  The Debtor admitted that she would be unable to afford to repay the Promissory Note at the contractual 11% non-default interest rate.  So, she just decided a 5% interest rate would be best for her.  The Debtor also explained her rationale for the lump sum payment to Shopneck during the month 19 of her Third Plan term.  She claimed that she needed 12 months of good payments on a loan to establish a sufficient payment history to obtain a 5% interest rate.  The Court finds such explanation without any basis since, under the Third Plan, she proposes to pay Shopneck no direct regular monthly payments.

4.      **Shopneck's Claim**.

Notwithstanding the Debtor's insertion in the Quitclaim Deed that she was assuming the Promissory Note, she never assumed the Promissory Note and was not

contractually entitled to do so.  RL is (and remains) the sole obligor on the Promissory Note.  The Debtor has no ability to alter any of the terms of the Promissory Note, through her Chapter 13 Plan or otherwise, because she is not a party to the Promissory Note.

In any event, on June 30, 2023, Shopneck filed its Proof of Claim (Claim No. 2-1, Ex. P, the "Shopneck Claim"). [4]  Shopneck claimed that its debt as of the Petition Date was $546,276.00.  Further, Shopneck asserted the 29% per annum default interest rate contained in the Promissory Note.  (There is no doubt that the Promissory Note is in default and has matured.)  The Debtor conceded the initial amount of the Shopneck Claim in her Third Plan.  (Docket No. 31 § 6.2.)  Since the Petition Date, the Shopneck Claim has increased dramatically because of the 29% per annum default interest rate contained in the Promissory Note.  The evidence shows that such rate results in a per diem interest accrual of $366.50.  260 days have passed from the June 12, 2023 Petition Date to February 27, 2024.  And, no amounts have been paid to Shopneck (and negotiated) since the bankruptcy filing.  As a result, and using the $366.50 per diem rate, the Shopneck Claim has grown by at least $95,290.00 during the Debtor's bankruptcy case (*i.e.* $366.50 X 260 = $95,290.00).  So, as of now, the Shopneck Claim is at least $641,566.00.  And such amount does not include additional late fees and attorneys' fees.

C.     **The Value of the Property**.

1.     **Debtor's Testimony on Value**.

The Debtor purchased the Property from her landlord-owners on June 22, 2021 for a purchase price of $650,000.00.  (Ex. 8 and 9.)  The Debtor, who claims to be the owner of the Property via the Quitclaim Deed, has consistently maintained that the value of the Property is approximately $784,000.00.  She arrived at that value through a Zillow search and also took into account the recent sale of a home on the same block as the Property for around $1,000,000.00.  The Debtor testified that home sales in the Park Hill neighborhood are rising steadily.  The Court finds the Debtor's testimony not very credible.  The Debtor has no training or knowledge about real estate valuation.  More to the point, her valuation estimate is far in excess of the opinion of her own expert witness.

---

[4]     The Debtor was not obligated on the Promissory Note.  RL, the Debtor's wholly-owned limited liability company, purchased the Property and was obligated on the Promissory Note.  The Debtor signed the Promissory Note on RL's behalf as its Member.  But then, on the eve of foreclosure and immediately before she filed her bankruptcy case, the Debtor transferred the Property to herself.  The Property, as property of the Debtor on the Petition Date, was subject to the lien of Shopneck.  So how is Shopneck a creditor of the Debtor?  Section 101(10) defines "creditor" to mean "an entity that has a *claim against the debtor* that arose at the time of or before the order for relief concerning the debtor."  Section 102(2) defines the phrase "claim against the debtor."  A "claim against the debtor includes claim against property of the debtor."  Once the Debtor caused RL to quitclaim the Property to herself, the Property became "property of the debtor" and was subject to the lien of Shopneck.

### 2. The Debtor's Real Estate Expert Opinion on Value.

The Debtor engaged a licensed real estate broker, Muriel Williams-Thompson, to conduct a Comparative Market Analysis of the Property. (Ex. B, the "CMA"). The goal was to provide the Debtor with pricing recommendation for sale of the Property. Ms. Williams is very well qualified. (Ex. B at 1.) She has been a licensed real estate broker operating in the Denver and Aurora residential real estate markets since July 2006. She maintains numerous professional affiliations involving real estate. Ms. Williams was born and raised in the Park Hill neighborhood where the Property is located. So she has great familiarity with the relevant residential market.

Ms. Williams visited the Property and prepared the CMA as of October 3, 2023. Ms. Williams described the Property as a brick house in good to excellent condition with some marketing pluses. The Property includes two bedrooms upstairs and two technically non-conforming basement bedrooms. The upstairs flooring is hard wood. The Property has a separate entrance to the basement. There is a garage. The Property is located on a corner lot.

Ms. Williams analyzed seven comparables: two were active listings (had not sold at the time) and five were sales that had closed. All of the selected comparables were properties constructed with brick and located near the Property in the Park Hill neighborhood. The majority of the selected comparables were south of the Property. Some of those properties varied a bit in square footage, but most were within close alignment to the Property.

Having taken all the features of the Property into consideration along with the comparables, Ms. William opined that her "Suggested value is $660,000." (Ex. B at 11.) Ms. Williams did not charge the Debtor to conduct the CMA, which she described as her typical practice. She also testified that she is not a licensed appraiser but has taken approximately 500 hours of appraisal courses which are about half of the courses an appraiser must take to obtain certification. The Court found the testimony of Ms. Williams to be credible, professional, informed, and helpful to the Court in its charge to assess the value of the Property.

### 3. Shopneck's Real Estate Expert Opinion on Value.

Shopneck retained a Certified Residential Appraiser, Kerry Dunn. Mr. Dunn has been appraising residential real estate since 1993. To obtain the certification he had to attend over 200 hours of in classroom instruction (plus testing) and apprentice for 2000 hours. Mr. Dunn's experience is exclusively in the residential real estate appraisal arena. He estimated that he has performed about 15,000 residential real estate appraisals during his career. Mr. Dunn is very familiar with the Park Hill area and has conducted appraisals there frequently (around monthly for the last 20 years).

Mr. Dunn used a sales comparison analysis of the Property to arrive at his valuation. (Ex. 3.) He prepared an appraisal as of September 11, 2023 (less than a

month before Ms. Williams prepared her CMA).  Mr. Dunn used six sales of comparable properties which had closed between April and August of 2023.  Of his comparable sales, only one was the same as Ms. Williams used in her CMA.  Each comparable was located less than a mile from the Property; but most were north of the Property.

In reaching his conclusion as to value, Mr. Dunn considered the square footage, room count, whether a basement existed and if it was finished, if there was a garage, and the location of the Property.  He considered the Property a conforming single-family home, with amenities such as the garage and basement.  He noted the nonconforming bedrooms in the basement but indicated that would not impact his valuation. He selected comparable sales that were geographically near the Property and had been sold closest in time.  He then tried to match features.  He reviewed public real estate records, county records, and MLS narratives and photos of the comparable properties. He also talked with some listing agents.  He made adjustments to the value of the Property using a computer program which he referred to as a "regression analysis." He used "Redstone" software but prefers to use "Synapse."  Mr. Dunn candidly acknowledged that he never entered the Property but had seen it from the street.

Mr. Dunn concluded that the market value of the Property was $600,000.00 as of September 11, 2023.  (Ex. 3 at 3.)  The Court finds Mr. Dunn to be credible and professional.  He is experienced in residential real estate appraisals and was familiar with the Park Hill neighborhood where the Property is located.

### 3.    <u>The Value of the Property No More than $660,000</u>.

As pointed out by both Ms. Williams and Mr. Dunn, each approached the valuation of the Property by using a sales comparison approach.  Their valuations were done close in time to each other.  Each came to the process with a different background and experience, and, therefore, perspective.  Ms. Williams is a realtor and provides potential sellers of real property with a Pricing Recommendation designed to assist them in arriving at a listing price.  Mr. Dunn, on the other hand, primarily assists lenders and, as an appraiser, uses a far more academic or theoretical approach.

From the testimony of both Mr. Dunn and Ms. Williams, the Court gleans that property values in Park Hill vary quite a bit depending on where in the Park Hill neighborhood of Denver a property is located.  The north-south geographic boundaries of Park Hill are between 38th Avenue and Colfax Avenue.  The east-west boundaries are between Quebec Street and Colorado Boulevard.  Each expert referred to 23rd Avenue as an imaginary dividing line at which values change.  Ms. Williams opined that real property north of 23rd Avenue was subject to historic discrimination which negatively impacts real property values to the present.  The Property is a block north of 23rd Avenue, so on the north edge of the imaginary dividing line.  Mr. Dunn drew his comparables mostly from homes which had sold north of the Property where values tend to be a little lower.  Ms. Williams, on the other hand, drew her comparable sales mostly from properties listed or sold south of the Property where values tend to be higher.  Ms. Williams testified on rebuttal that she reviewed Mr. Dunn's comparables

and noted that a number of his comparables did not have basements.  She considers a basement as a feature which warrants an upward adjustment in value.

In the end, the two expert valuations are not very far apart:  $660,000.00 vs. $600,000.00.  The difference is only about nine percent (9%).  Then there is the Debtor's value of $784,000.00.  The Debtor's estimate of the value of the Property exceeds her own expert's value by $124,000.00.  The Debtor relied on an internet website (Zillow) and a recent sale of a home on her block that sold for over $1,000,000.00.  However, that real estate had been a church that was converted to a home.  Notably, neither of the expert witnesses considered that sale as an accurate comparable sale for purposes of determining the value of the Property.  As such, the Court discounts the Debtor's valuation.

The Court is persuaded most by the opinion expressed by Ms. Williams.  She viewed the Property inside and out and her comparable sales included more properties which had basements.  Mr. Dunn never viewed the inside of the Property.  Thus, the Court concludes that the Property is worth no more than $660,000.00.

## IV.  Applicable Law and Conclusions of Law

### A.  Stay Relief Motion.

#### 1.  Statutory Framework and Burden of Proof.

Section 362(a) establishes an automatic stay in bankruptcy cases and generally prohibits:

> (1)  the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> . . . .
>
> (3)  any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4)  any act to create, perfect, or enforce any lien against property of the estate;
>
> (5)  any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a

> claim that arose before the commencement of the case under this title . . . .

11 U.S.C. §§ 362(a)(1), (3), (4) and (5).

Notwithstanding, the Bankruptcy Code permits relief from the automatic stay in certain circumstances.  Section 362(d) states:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —
>
>> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
>>
>> (2)    with respect to a stay of an act against property under subsection (a) of this section, if —
>>
>>> (A) the debtor does not have an equity in such property; and
>>>
>>> (B) such property is not necessary to an effective reorganization.

Shopneck requests relief from stay for "cause" under Section 362(d)(1), including lack of adequate protection of its interest in the Property.  In addition, it seeks relief from stay for lack of equity in the Property and because the Property is not necessary for an effective reorganization under Section 362(d)(2).

Relief from stay proceedings are summary in nature and determined on an expedited basis. "It is not a full determination of the merits." *U.S. Bank, N.A. v. Brumfiel (In re Brumfiel)*, 514 B.R. 637, 645 (Bankr. D. Colo. 2014).

Section 362(g) allocates the burden of proof, and states:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section-
>
>> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
>>
>> (2) the party opposing such relief has the burden of proof on all other issues.

15

11 U.S.C. § 362(g)(1) and (2).

In *In re Jim's Maintenance & Sons, Inc.*, 418 Fed. Appx. 726, 728 (10th Cir. 2011), the appellate panel explained the allocation of the burden of proof: "The moving party has the burden to show that cause exists to lift the stay, after which the burden shifts to a debtor to demonstrate why the stay should remain in place." *See also In re Gunnison Center Apartments, LP*, 320 B.R. 391, 395 (Bankr. D. Colo. 2005) (wherein the Court determined that "upon filing a relief from stay motion, the initial burden of going forward to show the grounds that compel the lifting of the stay rests with the creditor.").

### 2.   Shopneck Is Entitled to Relief from Stay for Cause Under Section 362(d)(1).

As noted in *JE Livestock, Inc. v. Wells Fargo Bank N.A. (In re JE Livestock, Inc.)*, 375 B.R. 892 (10th Cir. BAP 2007), the Bankruptcy Code does not define "cause." Consequently, relief based on a finding of cause "is a discretionary determination made on a case by case basis." *Busch v. Busch (In re Busch)*, 294 B.R. 137, 140 (10th Cir. BAP 2003). In *Jim's Maintenance*, the appellate court stated the standard similarly: "Relief from the automatic stay may be granted for cause . . . which involves a discretionary determination by the bankruptcy court made on a case by case basis." *Jim's Maintenance*, 418 Fed. Appx. at 728.

Ultimately, the Section 362(d)(1) question in this case comes down to whether the Court should grant relief from stay to permit Shopneck to recover the Property and to satisfy the debt owed on the Promissory Note. Shopneck contends that the Debtor did not file her case in good faith and Shopneck is not adequately protected.

### a.   The Debtor's Bad Faith Filing Constitutes Cause for Relief from Stay Under Section 362(d)(1).

"Bad faith filing" is a basis for relief from the automatic stay. *Udall v. FDIC (In re Nursery Land Development, Inc.)*, 91 F.3d 1414 (10th Cir. 1996); *Gunnison Center Apartments*, 320 B.R. at 399-400; *In re Pacific Rim Investments, LLP*, 243 B.R. 768 (D. Colo. 2000). The principal inquiry is whether the Debtor's bankruptcy petition constitutes an abuse of the bankruptcy system. But, to provide more specific inquiry in connection with bad faith filing determinations, courts have articulated various lists of factors to be considered. In *Nursery Land*, 91 F.3d at 1416, the Tenth Circuit stated that the bankruptcy court's conclusion that the debtor had filed its case in bad faith was "amply supported by numerous indicia that constitute badges of a bad faith bankruptcy filing." *Id*. According to the appellate court, factors to be considered include that the Debtor:

> (1) has only one asset;
> (2) has only one creditor;

16

(3) acquired the property which was posted for foreclosure and prior owners had been unsuccessful in defending against the foreclosure;
(4) was revitalized on the eve of foreclosure to acquire the insolvent property;
(5) has no ongoing business or employees;
(6) lacks a reasonable possibility of reorganization; and
(7) the [bankruptcy] filing stopped the foreclosure.

*Id.* Not all factors need be given equal weight and the exercise is not some sort of mathematic computation of facts. Bankruptcy courts are given substantial discretion in deciding such issues.

Such factor tests are sometimes hard to apply without understanding the overall purpose and context. As stated in *Gunnison Center*, 320 B.R. at 400:

The factors . . . are not exhaustive. Individual factors, in and of themselves, may not lead to a conclusion that a bankruptcy filing is in bad faith. Bad faith is found when the cumulative effect of these individual factors together paints a factual picture that leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate.

*Id.* The Court turns then to analyze the facts of this case under the framework of factors identified in *Nursery Land*, 91 F.3d at 1416. The Court observes that the facts identified in *Nursery Land* are remarkably similar to those in this case.

(1) <u>The Debtor has only one main asset</u>.

The Debtor in this case has only one principal asset: the Property. And she acquired it through the Quitclaim Deed approximately one month prior to filing her Chapter 13 Petition. The transfer was made for no consideration.

(2) <u>The Debtor has only one main creditor</u>.

As noted earlier in the Findings of Fact, Shopneck is the Debtor's most significant creditor as the holder of a claim against the Property. Shopneck is not her only creditor. She owes a large debt for student loans. But the Debtor excludes them from participating in any distributions under the Third Plan. And, such student loan debt is excepted from any discharge the Debtor might receive. Thus, the student loan debt does not seem to be a factor in the filing of the Debtor's Chapter 13 case.

The Debtor also scheduled about $34,000.00 of unsecured debt owed to less than a dozen creditors holding credit card debt or debts for "pay day loans." Those debts, however, were not the debts driving her bankruptcy filing. In fact, the Debtor's income appeared to be sufficient to have paid those debts if she were not paying RL's

debt to Shopneck.  The driving force behind her bankruptcy filing was without any doubt the Promissory Note and Deed of Trust.  The Debtor admitted as much during her testimony at the Combined Hearing.

> **(3)** <u>The Debtor acquired the property which was posted for foreclosure and prior owners had been unsuccessful in defending against the foreclosure</u>.

 The Debtor acquired the Property immediately after the May 15 Letter was sent to her as sole Member of RL.  The May 15 Letter advised the Debtor, as the representative of RL, that Shopneck would commence foreclosure proceedings against the Property.  When the Debtor filed her Statement of Financial Affairs in answer to Question No. 9, in Part 4, she stated that Shopneck had scheduled a foreclosure sale for September 21, 2023.  (Ex. C at 10.)  During the Combined Hearing, the Debtor admitted that she filed her Petition to keep the Property and give her time to obtain financing or to sell it.  Furthermore, very clearly, RL, the "prior owner," had defaulted on the Promissory Note in 2022 after struggling to make timely and complete payments.

> **(4)** <u>The Debtor lacks a reasonable possibility of reorganization</u>.

The Court will discuss this factor in more detail below.  The Debtor's Third Plan is not confirmable for multiple reasons including: lack of good faith in both the filing of her case and in the filing of her Third Plan; and her failure to provide for the full payment of the obligation owed to Shopneck in accordance with the terms of the Promissory Note and Deed of Trust.  The Debtor's Third Plan proposes to pay Shopneck a fixed amount in month 19 based upon the Shopneck Claim using a non-contractual 5% interest rate.  That proposed cramdown of another party's ((RL's) obligation cannot be performed in the Debtor's Chapter 13 case.

> **(5)** <u>The Debtor's Petition stopped the foreclosure</u>.

Before the Debtor filed her Petition, Shopneck commenced foreclosure proceedings.  The foreclosure sale was scheduled to take place on September 21, 2023.   When the Debtor filed her Petition on June 12, 2023, she stopped the Shopneck foreclosure process.

* * * * *

Under the *Nursery Land* factors, the Debtor filed her bankruptcy case in bad faith.  Furthermore, the totality of the circumstances strongly reinforces such conclusion.  The facts show that the Debtor, as the sole Member of RL, caused RL to purchase the Property for business investment purposes.  Since RL did not have the funds to make the purchase, RL used PineTree (a hard-money lender).  RL (through the Debtor who is an attorney), knowingly entered into the loan with Shopneck and executed the Promissory Note, Deed of Trust, and Loan Agreement.  Then, RL repeatedly defaulted in monthly payments to Shopneck.  Shopneck made demand for payment in full and

notified RL if its intention to commence foreclosure proceedings.  At that point, the Debtor engaged in a rather brazen bad faith scheme to thwart Shopneck.  First, the Debtor transferred the Property to herself — for no consideration.  Such transfer (which has all the hallmarks of a fraudulent conveyance) obviously violated the terms of the Promissory Note and Deed of Trust.  And, the Debtor hid what she had done from Shopneck.  Then, as a second bad faith step, the Debtor filed for protection under the Bankruptcy Code.  The foregoing demonstrates beyond doubt that Shopneck is entitled to relief from stay for cause under Section 362(d)(1).  *See Gunnison Center*, 320 B.R. at 400 ("Bad faith is found when the cumulative effect of these individual factors together paints a factual picture that leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate.").

        **b.**      **Shopneck Has Otherwise Demonstrated "Cause" for Relief from Stay Under Section 362(d)(1).**

Per the Tenth Circuit, "[t]he whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained for pre-bankruptcy."  *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  A creditor seeking relief from stay for lack of adequate protection bears an initial burden to show that its secured position is eroding or erosion is threatened.  *In re Anthem Cmtys./RBG, LLC*, 267 B.R. 867, 871 (Bankr. D. Colo. 2001).  "The erosion may be shown through evidence of declining property values, increasing amount of the secured debt through interest accruals or otherwise . . . or other factors that may jeopardize the creditor's present position."  *Id.*

The Court already has determined that the value of the Property is, at most, $660,000.00.   As of the Petition Date, the Shopneck Claim was $546,276.96.  The Debtor effectively adopted that amount in her Third Plan.  (Docket No. 31 § 6.1; identifying the "total default amount to be cured" as $546,276.96).  And the Debtor has not objected to the Shopneck Claim.  However, since the Petition Date, the Shopneck Claim has increased dramatically because of the accrual of interest at the contractual default interest rate of 29% per annum.  The per diem interest accrual is $366.50.  As a result, the Shopneck Claim has grown by at least $95,290.00 during the Debtor's bankruptcy case so far (*i.e.* $366.50 X 260 days = $95,290.00).  So, as of now, the Shopneck Claim is at least $641,566.00.  The monthly interest accrual is about $10,995.00 (*i.e.,* $366.50 X 30 days = $10,995.00).  And such amount does not account for additional late fees and attorneys' fees.  Meanwhile, the Debtor has not paid anything to Shopneck even though the Debtor currently is paying $4,600.00 per month to the Chapter 13 Trustee.  If the Third Plan is confirmed, at best, Shopneck would receive some portion of the monthly $4,600.00 plan payment to the Chapter 13 Trustee. But obviously, such payment would be far less than half of the interest accrual. Shopneck's eroding position justifies relief from stay for cause under Section 362(d)(1).

**3.** **Shopneck Is Entitled to Relief from Stay for the Debtor's Lack of Equity Under Section 362(d)(2) and Since the Property Is Not Necessary to an Effective Reorganization**.

Focusing on Section 362(d)(2), there are two parts: (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization.

The Court starts with issue of equity. The calculation of whether there is equity in the Property is mathematical. The Court must take into account all encumbrances against the Property and subtract them from the current value. *In re Steffens*, 275 B.R. 570, 577 (Bankr. D. Colo. 2002). In addition, if the Debtor contemplates a sale of the property, the costs of sale must be taken into account. *Id.* at 578 ("Because the contemplated use of the property is the sale of some or all of the parcels, costs of sale must be considered as well. Even a meager 5% cost of sale will wipe out any potential equity.")

The Court already has concluded that the Property is worth (at most) $660,000.00. There are two encumbrances. $2,545.70 in property taxes is owed to the Denver County Treasurer. And, as of today, Shopneck is owed at least $641,566.00 on the Promissory Note (excluding late fees and attorneys' fees). So, the liens aggregate at least $644,111.70. Then, the Court subtracts the standard costs of sale. *Steffens*, 275 B.R. at 578. Using a conservative 5% for costs of sale yields $33,000.00. So, Shopneck has established that the Debtor has no equity in the Property.

Not only does the Debtor lack any equity in the Property, the Property also is not "necessary to an effective reorganization." Per the United States Supreme Court:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means, as many lower courts . . . have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375-76 (1988). As set forth below, the Third Plan is not confirmable. So, there is no "reasonable possibility of a successful reorganization within a reasonable time." Furthermore, the Debtor failed to prove that her retention of the Property is necessary at all. The terms of the Third Plan state that "[t]he debtor intends to either sell her personal residence . . . or to refinance the loan . . . ." Ergo, the Third Plan itself proves

that it is not necessary for the Debtor to retain the Property.  As a result, relief from stay under Section 362(d)(2) is mandated.

**B.      Confirmation.**

The Debtor asks that the Third Plan be confirmed under Section 1325(a).  Shopneck objects to confirmation on the grounds that the Debtor has not filed her Third Plan in good faith, the Debtor cannot modify the Promissory Note, and the Third Plan is not feasible.

### 1.      Burden of Proof for Confirmation.

The Debtor bears the burden of proving the required elements of Section 1325.  *In re Gosch*, 627 B.R. 669, 680 (Bankr. D. Colo. 2021); *In re Styerwalt*, 610 B.R. 356, 368 (Bankr. D. Colo. 2019); *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019); *In re Vinger*, 540 B.R. 782, 786 (Bankr. D. Colo. 2015); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014).  The legal standard is the preponderance of the evidence.  *In re Fassi*, 2013 WL 2190158, at *1 (Bankr. D. Colo. May 21, 2013) (citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002)).

### 2.      The Applicable Sections of 11 U.S.C. 1325(a).

The confirmation analysis must start with the applicable Sections of the Bankruptcy Code, particularly, Sections 1325(a)(1), (a)(3), (a)(6) and (a)(7).  The subsections of Section 1325(a), which are essentially the elements a debtor must demonstrate to confirm a plan, are listed in the conjunctive and not in the disjunctive.  So, a debtor must prove all applicable section to achieve confirmation.  If a debtor fails to prove one element, that failure is fatal to confirmation.

Per Section 1325(a)(1), the Debtor must show that "the plan complies with the provisions of this chapter and with the other applicable provisions of this title."  Section 1325(a)(3) mandates the Debtor to prove that "the plan has been proposed in good faith and not by any means forbidden by law."  Section 1325(a)(6) states a feasibility requirement:  "the debtor will be able to make all payments under the plan and to comply with the plan."  Finally, Section 1325(a)(7) mandates that the Debtor prove the "action of the debtor in filing the petition was in good faith."

The Court has already concluded that the Debtor lacked good faith in the filing of her Chapter 13 case using a set of factors prescribed by the Tenth Circuit in *Nursery Land*, 91 F.3d 1414.  Thus, at the outset, the Court will analyze the Section 1325(a)(3) and (a)(7) good faith requirements.

### 3.      Debtor Did Not File her Petition in Good Faith (Section 1325(a)(7)).

Section 1325(a)(7) mandates that the debtor prove that "the action of the debtor in filing the petition was in good faith."  The Section 1325(a)(7) "good faith filing"

21

requirement was added to Section 1325 with the codification of the Bankruptcy Abuse Protection and Consumer Protection Act of 2005 ("BAPCPA").  *In re Tomasini*, 339 B.R. 773, 775 (Bankr. D. Utah 2006).  The Court already reached the conclusion that the Debtor had filed her Petition in bad faith in the context of the Stay Relief Motion.  The standards used under Section 1325(a)(7) are sometimes characterized slightly differently than under Section 362(d)(1).  But it all comes back to the "totality of the circumstances."  *See e.g. In re Johnson*, 2021 WL 6053832, at *9 (Bankr. D. Colo. Dec. 15, 2021) ("Generally, 'in determining whether a Chapter 13 petition has been filed in bad faith under Section 1307(c), the bankruptcy court must consider the 'totality of the circumstances.'"); *Tomasini*, 339 B.R. at 775 (employing the totality of the circumstances test under Section 1325(a) and evaluating the debtor's subjective good faith).

The "totality of the circumstances" approach focuses on whether there has been an "abuse of the provisions, purposes, or spirit of [the Bankruptcy Code]."  *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993) (construing good faith under Section 1307(c)).  In *Gier*, the Tenth Circuit endorsed the following seven factors as relevant to a Section 1307(c) bad faith filing inquiry:

> [1] the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; [2] the timing of the petition; [3] how the debt arose; [4] the debtor's motives in filing the petition; [5] how the debtor's action's affected creditors; [6] the debtor's treatment of creditors both before and after the petition was filed; and [7] whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Gier*, 986 F.2d at 1329.

Regardless of how the factors are phrased, the totality of the circumstances establishes that the Debtor did not file her Petition in good faith.  RL obtained a loan from Shopneck for RL to purchase the Property in 2021.  As set forth in the Promissory Note, Deed of Trust, and Loan Agreement, the terms were steep.  RL agreed to a high initial interest rate and an even higher default interest rate.  RL defaulted by failing to timely pay Shopneck.  And, the obligation also matured.  When RL could no longer meet the terms of the Promissory Note, Shopneck threatened foreclosure of the Property to collect the debt.  At that stage, the Debtor promptly executed the Quitclaim Deed on behalf of RL conveying the Property to herself for no consideration.  She hid the maneuver from Shopneck.  Such actions reek of bad faith.  Then, within a month thereafter, the Debtor filed her Chapter 13 Petition.  The Debtor's motives in filing the Petition are patent: to interfere in Shopneck's ability to collect on the debt owed by RL and secured by the Property.  The Debtor engaged in a classic shell game of moving an asset.  The result has been predictable, Shopneck has been stopped from foreclosure and has not been paid for almost a year (since March 31, 2023).  Thus, the Debtor failed to meet the mandate of Section 1325(a)(7).

**4.      The Debtor Did Not File the Third Plan in Good Faith (Section 1325(a)(3)).**

Section 1325(a)(3) is slightly different than Section 1325(a)(7) because Section 1325(a)(3) asks whether "the plan has been proposed in good faith . . . ." rather than whether the "action of the debtor in filing the petition was in good faith."  *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir. 1983) is the seminal Tenth Circuit precedent on Section 1325(a)(3).  In *Flygare*, the Tenth Circuit Court of Appeals announced a "totality of the circumstances" approach in which:

> The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case.  If, after weighing all the facts and circumstances, the plan is determined to constitute an abuse of the provisions, purpose or spirit of Chapter 13, confirmation must be denied.

709 F.2d at 1347 (quoting *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 316-17 (8th Cir. 1982)).  The Tenth Circuit adopted a list of eleven factors to be considered in the good faith analysis:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
> (3) the probable or expected duration of the plan;
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
> (5) the extent of preferential treatment between classes of creditors;
> (6) the extent to which secured claims are modified;
> (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
> (8) the existence of special circumstances such as inordinate medical expenses;
> (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
> (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
> (11) the burden which the plan's administration would place upon the trustee.

*Id.* at 1347-48 (quoting *Estus*, 695 F.2d at 317); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174-75 (10th Cir. 2001) (reconfirming *Flygare* factors for good-faith

23

evaluation); *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 (10th Cir. 1993) (same); *Pioneer Bank v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 704 (10th Cir. 1989) (same).  The *Flygare* list is "not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case."  *Flygare*, 709 F.2d at 1348.  Although the *Flygare* decision pre-dates the 2005 BAPCPA changes to the Bankruptcy Code, including the changes to Sections 1325(b)(1)(B) and 1325(b)(2), the Tenth Circuit has confirmed the vitality of *Flygare* post BAPCPA.  *See Anderson v. Cranmer (In re Cranmer)*, 697 F.3d 1314, 1318-19 (10th Cir. 2012).

The *Gier* seven factor "totality of circumstances test" tracks very closely with the *Cranmer/Flygare* eleven factor "totality of circumstances test."  Thus, the Court will not separately analyze each of the *Flygare* factors.  And, given the overlap with the bad faith analysis for the Stay Relief Motion and under Section 1325(a)(7), the Court need not belabor the issue.  It is plain that the Debtor filed the Third Plan in bad faith.  She engaged in a scheme to stop Shopneck from collecting the debt owed by RL under the Promissory Note.  She caused RL to transfer the Property to herself for nothing.  And, then, she filed for bankruptcy protection.

The Third Plan is more of the same.  In the Plan, the Debtor simply ignores the contractual default interest rate and arbitrarily proposes that the Promissory Note be modified to a 5% interest rate.  However, the Debtor has provided the Court with no authority for the Debtor to do so.  After all, she is not a signatory on the Promissory Note.  RL is the obligor.  The Debtor cannot change a non-bankrupt third parties' contract terms.  The scheme she executed to forestall Shopneck, including the Third Plan, is the definition of bad faith.

5.   **The Third Plan is Unconfirmable as an Impermissible Attempt to Modify a Contract to Which the Debtor Is Not a Party (Sections 1325(a)(1), (a)(5) and 1322).**

The Debtor's entire bankruptcy case, including the Third Plan, is built on a façade.  RL borrowed money from Shopneck under the Promissory Note.  The obligation was secured by the Property.  When RL defaulted under the Promissory Note, Shopneck became entitled to foreclosure on its collateral: the Property.  At that point, the Debtor had no interest in the Property and was not obligated on the Promissory Note.  Then, to stop the imminent foreclosure the Debtor executed a wrongful transfer of the Property from RL to herself — for no consideration.  Now, through the Third Plan, the Debtor effectively proposes to modify the Promissory Note and cramdown Shopneck by: (1) unilaterally reducing the interest rate from the current (and pre-petition) 29% per annum default interest rate to a 5% per annum rate; and (2) extending the term from June 21, 2023 to February 12, 2025.  But, the Bankruptcy Code simply does not authorize the Court to restructure the obligations of a non-bankrupt party: RL.  In closing argument, the Court asked Debtor's counsel to provide any supporting legal authority.  Debtor's counsel only referred to *Till v. SCS Credit Corp.*, 124 S. Ct. 1951 (2004).  However, *Till*, does not hold that a bankruptcy court may restructure the obligations of a non-bankrupt party.  Having further considered and

24

researched the topic, the Court has reached the conclusion that the Debtor's position is bereft of any legal basis whatsoever.  So, the Third Plan is facially unconfirmable.

## VI.    Conclusion and Orders.

For the reasons set forth above, the Court:

ORDERS that the Stay Relief Motion is GRANTED.  Shopneck is GRANTED relief from stay pursuant to Sections 362(d)(1) and (2), to pursue its rights and remedies against the Property, 2400 N. Olive Street, Denver, Colorado 80207, at State law and in accordance with the terms of the Promissory Note and Deed of Trust; and

FURTHER ORDERS that the Order granting Shopneck relief from stay shall be effective immediately and the stay imposed by Fed. R. Bankr. P. 4001(a)(3) shall not be in effect; and

FUTHER ORDERS that the Debtor's request to confirm her Third Plan is DENIED; and

FURTHER ORDERS that the Debtor is afforded 14 days from the entry of this Order to file a fourth Chapter 13 plan, or to move to dismiss or convert her case, failing which, the case will be dismissed.

DATED this 28th day of February, 2024

BY THE COURT:

_Thomas B. McNamara_
Thomas B. McNamara,
United States Bankruptcy Judge

25